# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,     )
     )
     Plaintiff,     )
     )     Case No. 14-CR-2029-MV
     vs.     )
     )
WANDA COOPER,     )
     )
     Defendant.     )

## UNITED STATES' RESPONSE TO DEFENSE MOTION TO SUPPRESS

The United States respectfully files this response to Defendant's Motion to Suppress, Doc. 14.

### Issue

Whether Drug Enforcement Administration ("DEA") Special Agent ("SA") Jarrell Perry had probable cause to arrest defendant Wanda Cooper ("Defendant") when he arrested her and searched her person, locating methamphetamine secured in bundles around her waist.

### Factual Background

Were this matter to proceed to a hearing, the United States would call DEA SA Jarell Perry to testify. Upon information and belief, SA Perry would testify that:

### The Greyhound Bus Station

1. On the morning of May 20, 2014, SA Perry was waiting for the Greyhound bus entering Albuquerque from the west. SA Perry meets approximately twenty buses every week the same way.

2.  SA Perry knows, from his training and experience, that drug traffickers prefer the bus or the train to airplanes for long-distance travel to avoid the scrutiny of the Transportation Security Administration.

3.  SA Perry knows, from his training and experience, that couriers working for drug trafficking organizations tend to transport drugs east from California or Arizona, and that couriers traveling west are more likely to carry money back to those organizations.

4.  SA Perry had access to the passenger manifest in advance of the arrival of the bus. Among other things, one thing SA Perry noticed about the passenger manifest prior to the arrival of the bus was that there were two passengers who were scheduled to travel to St. Paul, Minnesota from California.

5.  On the morning of May 20, 2014, the eastbound bus was scheduled to arrive at the Albuquerque station at 10:05 a.m. and depart at 11:10 a.m.

6.  Greyhound currently runs two sizes of busses, one seating 51 passengers and the other seating 55 passengers.

<u>The Bus Arrives</u>

7.  The Greyhound bus on which Defendant was traveling east and arrived near its scheduled arrival time. Passengers were instructed to exit the bus during the cleaning and fueling layover, which would last approximately one hour, and were instructed that they could either take their bags with them or leave the bags on the bus.

<u>Interaction With the Defendant</u>

8.  Prior to the passengers re-boarding the bus, SA Perry boarded the bus so he could conduct consensual encounters with passengers as they re-boarded. He does this so that he can maximize the number of passengers to whom he can speak without delaying the bus's departure.

9.  SA Perry activated his personal audio recorder. On the morning of May 20, 2014, SA Perry's voice recorder operated properly and the encounter described below is recorded.

10. SA Perry approached a woman, later identified as Defendant, who was seated on the left hand side of the bus (from the perspective of someone facing towards the front of the bus), approximately five or six seats from the front of the bus, in the aisle seat. SA Perry approached the Defendant from her right rear and stood to the rear of her seat, so that her egress from the bus would not be blocked if she should choose to leave.

11. SA Perry said hello and asked how Defendant was that day. Defendant responded that she was fine. SA Perry showed his badge to Defendant, identified himself as a police officer, and asked her to where she was traveling. Defendant responded "yeah" and nodded her head "yes." SA Perry reiterated his question, and Defendant said "St. Paul." SA Perry asked if she meant St. Paul, Minnesota, and Defendant responded "yeah."

12. SA Perry then asked Defendant where she was traveling from, and Defendant responded "Indio, California." SA Perry asked whether Defendant lived in St. Paul or in Indio, and Defendant responded that she lived in Indio.

13. SA Perry then asked Defendant if she were traveling alone or with someone else, and Defendant responded "by myself." SA Perry was interested by this, because the passenger manifest showed two passengers, one having bought their ticket with a man's name and one with a woman's name, scheduled to travel from California to St. Paul, Minnesota.

14. SA Perry then asked Defendant if she had any luggage with her on the bus, and Defendant responded "underneath," indicating she had luggage in the luggage compartment under the passenger section of the bus. SA Perry asked Defendant if she had any other luggage with her by the seat area, and Defendant answered "no."

15. SA Perry asked Defendant what the purpose of her trip to Minnesota was, and Defendant answered "to visit." SA Perry then thanked Defendant and ended that encounter with her.

16. SA Perry then spoke with various other passengers as they reboarded the bus. SA Perry noticed a male, later identified as Dewayne Connor, walking back and forth and peering at various seats as if he were looking for something. SA Perry observed Connor sit, and approached Connor, displaying his badge and introducing himself as a police officer. Connor responded "I've already heard of you."

17. SA Perry asked Connor for permission to speak with him, and Connor said "Yes, sir." SA Perry asked Connor where he was traveling to and Connor said "Minneapolis." SA Perry asked Connor where he was traveling from, and Connor responded "Indio, California." SA Perry asked Connor if he were traveling alone or with someone else, and Connor responded "by myself."

4

18. SA Perry realized that Minneapolis and St. Paul are close to each other in Minnesota. Indeed, Minneapolis and St. Paul are the "Twin Cities" of Minnesota.

19. SA Perry asked Connor if he had his bus ticket with him, and Connor nodded "yes." SA Perry asked to see his bus ticket, and Connor began to search for said ticket with his hands. Connor then handed SA Perry a ticket folder.

20. SA Perry asked Connor if he lived in Indio or Minneapolis, and Connor responded "I live in Minne… Indio, I'm moving to Minneapolis, though."

21. SA Perry reviewed the ticket folder Connor had handed him, and saw that it contained a ticket in the name of "Wanda Wheeler." SA Perry immediately returned the bus ticket to Connor.

22. SA Perry, after reviewing Connor's identification and returning it to him, asked if Connor had luggage with him, and Connor responded "yeah, it's underneath." SA Perry asked how many pieces, and Connor said "one." SA Perry asked what the bag looked like, and Connor said "black." SA Perry asked Connor whether it was a suitcase or duffel bag, and Connor said "duffel bag."

23. SA Perry asked Connor for permission to search the bag, and Connor said "for what?" SA Perry explained that he was asking for permission to search it, and Connor declined.

24. SA Perry then asked Connor for permission to search his person, Connor consented, and SA Perry searched Connor's person, not finding any contraband.

25. SA Perry then returned to Defendant, and asked for permission to see her ticket. Defendant handed SA Perry a Greyhound bus ticket in the name of "Joe Wheeler." SA Perry reviewed the ticket briefly, then returned it to Defendant.

26. SA Perry asked Defendant if she had identification with her, and Defendant handed him identification in the name of Wanda Cooper. SA Perry reviewed the identification card and returned it to Defendant.

27. SA Perry asked Defendant again if she had luggage with her, and again Defendant answered "it's underneath." SA Perry asked Defendant for permission to search her bag, and she consented, describing the bag to SA Perry.

28. SA Perry asked Defendant for permission to search the pillow she had with her, and Defendant handed SA Perry the pillow. SA Perry searched the pillow, not finding any contraband, and handed the pillow back to Defendant.

29. SA Perry then asked Defendant if she had anything around her waist or her body, and Defendant did not respond. SA Perry asked Defendant if she would consent to a search of her person, and Defendant said "I don't want a man to search me." SA Perry observed Defendant move a blue-colored blanket that had been partially over her shoulder across her body, covering the majority of her upper body.

30. SA Perry observed a large bundle protruding from under the clothing Defendant was wearing near her waist, and told Defendant that he could see it. SA Perry observed, from his training and experience, that the protrusion he saw was consistent with the sort of bundles of narcotics that "body carriers" often strap around their midsection.

31. SA Perry asked Defendant if she would remove the blanket, and asked Defendant if she had something underneath her shirt. Defendant responded "my stomach." SA Perry informed Defendant that he knew it was not her stomach that he saw, and Defendant replied "yes, it is." SA Perry asked Defendant again if she had something around her waist, and Defendant said "no, I don't."

32. SA Perry asked Defendant if she would show SA Perry her bag underneath of the bus, and Defendant responded "fine." Defendant began to gather her purse and pillow, and SA Perry informed her that she did not have to take her belongings with her.

33. Defendant walked off the bus, followed by SA Perry. Defendant identified a small, red-colored suitcase underneath the bus as belonging to her.

34. SA Perry asked Defendant if she were traveling with anyone, and she said "no." SA Perry asked if she were traveling with the man he had spoken with, and she said "no."

35. SA Perry informed Defendant that he knew that the bundle he had observed under her shirt was not her stomach, and she responded "it's a shit bag" (colostomy bag). SA Perry knew that it was not a colostomy bag because of its irregular shape.

36. SA Perry decided to arrest Defendant, instructed her to put her hands behind her back, and handcuffed her.

37. The bundle under Defendant's shirt was later found to contain methamphetamine, and after being arrested and appraised of her right to remain silent, Defendant gave additional incriminating statements.

## Argument

SA Perry engaged in several consensual encounters with Defendant and her apparent traveling companion, through which he was able to develop probable cause that she possessed contraband. His discussions with Defendant and her apparent traveling companion up to the moment he arrested Defendant were consensual, and that consent was free and voluntary. At the moment SA Perry invoked his official arrest power and Defendant submitted to that show of force, SA Perry had probable cause that she was committing a crime. SA Perry's arrest of Defendant was lawful, and the evidence flowing from that arrest should not be suppressed.

I.   Defendant Freely and Voluntarily Consented to Her Encounter With SA Perry

SA Perry's conversation with Defendant does not constitute a seizure if Defendant freely and voluntarily consented to it. The inquiry regarding whether Defendant's consent to her encounter with SA Perry was free and voluntary is an objective one. As the Supreme Court made clear in Florida v. Bostick, 501 U.S. 429, 439 (1991):

> We adhere to the rule that, in order to determine whether a particular encounter constitutes a seizure, a court must consider all the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officer's requests or otherwise terminate the encounter.

That inquiry is an objective one. As the Tenth Circuit explained, "As long as a reasonable innocent person, as opposed to a person knowingly carrying contraband, would feel free to leave, such encounters are consensual and need not be supported by reasonable suspicion of criminal activity." *United States v. Laboy*, 979 F.2d 795, 798 (10th Cir. 1992). No per se or absolute rules govern this inquiry. *See Ohio v. Robinette*, 519 U.S. 33, 39, 136 L. Ed. 2d 347, 117 S. Ct. 417 (1996); *Little*, 18 F.3d at 1503-04. "Rather, every case turns on the totality of the circumstances

presented." *Little*, 18 F.3d at 1503. *See also United States v. Drayton*, 536 U.S. 194 (2002)

(holding defendants were not seized by agents while agents conducted consensual encounters on

a bus, and detailing why).

The Tenth Circuit has, consistent with the later *Drayton* decision, identified various

factors relevant to whether a reasonable person would not feel free to terminate an encounter

with police:

> the threatening presence of several officers; the brandishing of a weapon by an officer;
> some physical touching by an officer; use of aggressive language or tone of voice
> indicating that compliance with an officer's request is compulsory; prolonged retention of
> a person's personal effects such as identification and plane or bus tickets; a request to
> accompany the officer to the station; interaction in a nonpublic place or a small, enclosed
> place; and absence of other members of the public.

*United States v. Sanchez*, 89 F.3d 715, 718 (10th Cir. 1996). The Tenth Circuit has "steadfastly

refused to view any one of these factors as dispositive." *United States v. Glass*, 128 F.3d 1398,

1406 (10th Cir. 1997).

During her conversations with SA Perry, Defendant was free to terminate the

conversation or leave at any time. SA Perry stood to the rear of her seat so that he did not

physically block her exit. SA Perry did not draw or even display his sidearm. Defendant was not

surrounded by multiple police officers. SA Perry spoke to Defendant in a quiet, respectful tone.

SA Perry did not physically touch Defendant. SA Perry did not prolong his retention of

Defendant's personal effects, instead returning her ticket, her identification, and her pillow

immediately upon examining them. SA Perry did not request Defendant accompany him to a

police station. SA Perry interacted with Defendant in public, not in a small or enclosed place cut

off from the observation of other members of the public. While it is true that SA Perry did not

explicitly explain to Defendant that she did not have to speak with him or that she was free to

leave at any time, that is only one of the factors to be analyzed in the totality of the circumstances approach used by the Tenth Circuit. *See United States v. Hill*, 199 F.3d 1143, 1147-48 (10th Cir. 1999). Indeed, the Tenth Circuit has found that whether a defendant was specifically informed of their right to refuse consent, having been rejected as a requirement by the Supreme Court, "should carry little weight" in the analysis. *U.S. v. Thompson*, 546 F.3d 1223, 1228 (10th Cir. 2008). Here, that analysis leads only to the conclusion that Defendant's consent to interact with SA Perry was knowing and voluntary.

II.  <u>When SA Perry Arrested Defendant, He Had Probable Cause.</u>

SA Perry's consensual encounter with Defendant ended when they were both standing outside the Greyhound bus and he arrested and handcuffed her. That arrest was lawful because SA Perry had probable cause to believe Defendant was committing a crime, specifically transporting illegal narcotics.

The probable cause standard is met if, after a practical, common-sense review of the facts, there is a "fair probability" a crime is being committed. *See Illinois v. Gates*, 462 U.S. 213, 238 (1983) (discussing the probable cause standard in the context of a search warrant application). Probable cause is measured against an objective standard**.** *Beck v. Ohio*, 379 U.S. 89, 96, 13 L. Ed. 2d 142, 85 S. Ct. 223 (1964). The subjective belief of an individual officer as to whether there was probable cause for making an arrest is not dispositive. *Florida v. Royer*, 460 U.S. 491, 507, 75 L. Ed. 2d 229, 103 S. Ct. 1319; *United States. v. Treto-Haro*, 287 F.3d 1000, 1006 (10th Cir. 2002). Thus, the primary concern is "whether a reasonable officer would have believed that probable cause existed to arrest the defendant based on the information possessed

by the arresting officer." *Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1312 (10th Cir. 2002)

(internal quotation marks and alterations omitted).

Courts may not engage in a "divide-and-conquer" analysis of facts to determine whether

probable cause existed. *See United States v. Arvizu*, 534 U.S. 266, 274, 151 L. Ed. 2d 740, 122 S.

Ct. 744 (2002). In assessing the totality of the circumstances, a reviewing court "must examine

the facts individually in their context to determine whether rational inferences can be drawn from

them" that support a probable cause determination. *United States v. Martinez-Cigarroa*, 44 F.3d

908, 911 (10th Cir. 1995). A factor does not become irrelevant simply because it is "readily

susceptible to an innocent explanation." *Arvizu*, 534 U.S. at 274.

The facts that led SA Perry reasonably to determine there was a fair probability to believe

Defendant possessed contraband were as follows:

1. Defendant was traveling from west to east on the Greyhound bus, a favored direction and mode of transportation for drug traffickers.

2. Defendant was traveling under a false name.

3. Defendant lied to SA Perry regarding whether she was traveling alone or with another person.

4. Defendant's traveling companion acted suspiciously, was also traveling under a false name, and falsely denied traveling with Defendant.

5. SA Perry observed an irregular bundle hidden under Defendant's clothing.

6. Defendant lied to SA Perry regarding the appearance of the bundle, claiming first that it was only her stomach.

7. Defendant moved a blanket in an attempt to conceal the bundle under her shirt.

11

8. When SA Perry confronted Defendant regarding the lie that the shape under her shirt was her stomach, Defendant told a different lie, claiming that the shape under her shirt was a colostomy bag, which SA Perry knew also to be false.

SA Perry was not unreasonable to believe that all those facts, reviewed together, constituted a fair probability that Defendant possessed contraband. While the correctness of SA Perry's conclusion does not in and of itself validate his decision or cut off the court's opportunity to review his conduct, any reasonable and experienced officer would believe that probable cause existed based on those same facts. *See  Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1312 (10th Cir. 2002). No more is required. Because SA Perry's decision to arrest Defendant was supported by probable cause, that arrest was lawful, and the physical evidence later seized from Defendant's person and the statements given by Defendant after being warned of her right not to testify against herself should not be suppressed.

## CONCLUSION

For the reasons outlined above, the Defendant's Motion to Suppress, Doc. 14, should be denied. The filing of this document in CM/ECF caused a copy to be served electronically on Brian Pori, Esq., counsel for Defendant.

Respectfully submitted,

DAMON P. MARTINEZ
United States Attorney

Electronically filed July 11, 2014
PAUL MYSLIWIEC
Assistant United States Attorney
P.O. Box 607
Albuquerque, New Mexico  87103
(505) 346-7274