IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　　Plaintiff,<br><br>　vs.<br><br>WANDA KAY COOPER.<br><br>　　　　　Defendant. | No. 14-CR-2029-MV |

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on Defendant Wanda Kay Cooper's Motion to Suppress Evidence [Doc. 14].  The government filed a Response [Doc. 17], Cooper filed a Reply [Doc. 22], and the Court held an extended hearing on the Motion on December 2, 2014 [Doc. 36].  The Court, having considered the Motion, briefs, hearing testimony, exhibits, relevant law, and being otherwise fully informed, finds that the Motion is well-taken and will be **GRANTED.**

### BACKGROUND

On May 20, 2014, Special Agent Jarrell Perry of the United States Drug Enforcement Agency ("DEA") was working drug interdiction at the Greyhound bus station in Albuquerque, New Mexico.  Doc. 36 at 3-5.  Special Agent Perry noticed two passengers listed in the manifest of an eastbound Greyhound bus; they shared the surname "Wheeler," both originated in Indio, California, and were destined for the Twin Cities of Minnesota.  *Id.* at 7-8.  When the bus arrived in Albuquerque at approximately 10:00 a.m., the passengers "were instructed to exit the bus during the cleaning and fueling layover."  Doc. 17 at 2.  *See also* Doc. 36 at 11-12.  During the

1

stop, Special Agent Perry "boarded the bus prior to the passengers reboarding" so that he could speak with people before the bus departed the station in Albuquerque.  Doc. 36 at 12.

Aboard the bus, Special Agent Perry "approached a woman, later identified as Wanda Kay Cooper, who was seated on the left hand side of the bus" a few rows from the front.  Doc. 17 at 4.  *See also* Doc. 14 at 2; (0:54).[1]  While the government states that Special Agent "Perry approached the Defendant from her right rear and stood to the rear of her seat, so that her egress from the bus would not be blocked if she should choose to leave," Cooper contends, presumably in an effort to demonstrate coercion, that Special Agent Perry "stood in front of Ms. Cooper [and] blocked her egress from the bus."  *Compare* Doc. 17 at 3 *with* Doc. 14 at 2.  The uncontroverted testimony by Special Agent Perry establishes that he "stood to the rear of her, displayed [his] badge to her, identified [himself] as a police officer, and asked permission to speak with her."  Doc. 36 at 15.  *See also* (0:56 – 0:58).  Cooper agreed to speak with him, although she adds that she felt that "she could not decline the request."  Doc. 14 at 2.  *See also* Doc. 17 at 3.

Special Agent Perry asked where the Defendant was travelling that day; Cooper responded that she was going to St. Paul, Minnesota from Indio, California.  Doc. 17 at 3; (1:02). Defendant also indicated during their conversation that she was traveling by herself (1:14); this apparently caught Special Agent Perry's attention as "the passenger manifest showed two passengers, one having bought their ticket with a man's name and one with a woman's name" who were both destined for Minnesota.  Doc. 17 at 4.  *See also* Doc. 36 at 17-19.

---

[1] Citations to timestamps refer to an audio recording of the encounter made by a device worn by Special Agent Perry and entered into evidence at the hearing as Government's Exhibit #1.

Special Agent Perry left the Defendant and began to speak with other passengers (1:40 – 5:40); the special agent soon "noticed a male, later identified as Dewayne Connor, walking back and forth and peering at various seats as if he were looking for something." Doc. 17 at 4. *See also* Doc. 36 at 17. This man then "sat down in the seat one seat to the rear and across the aisleway from Miss Cooper." Doc. 36 at 17. Special Agent Perry repeated his routine with Connor (5:42 – 5:50), who replied that he was travelling alone from Indio, California to Minneapolis, Minnesota. Doc. 17 at 4; (5:50 – 5:58). Special Agent Perry inspected Connor's bus ticket, which bore the name "Wanda Wheeler." Doc. 17 at 5; (5:58 – 6:20). Special Agent Perry "obviously" believed that the ticket did not bear his name "because [Wanda Wheeler] was a female name" and so asked "him if he had identification with him that [the special agent] could see." Doc. 36 at 18. The man handed him "identification under the name of Dewayne Connor, which obviously meant that he was not traveling under his right name." *Id.*

Connor declined to permit Special Agent Perry to search his duffle bag, but consented to a quick search of his body. *Id.* at 18-19. After searching Connor's person and not finding any contraband (7:18), Special Agent Perry returned to Cooper and asked to see her bus ticket and identification. Doc. 14 at 2; Doc. 36 at 19; (7:22). Apparently suspicious that the name on her ticket, "Joe Wheeler," did not match the name on her identification, but did correspond to Connor's ticket, Special Agent Perry asked to search Cooper's pillow (8:36); finding nothing, he asked if she would consent to a search of her person. Doc. 36 at 19-20; (8:48). Cooper declined, stating that she did not want a man to search her. Doc. 14 at 3; Doc. 17 at 6; (8:53).

At some point during this encounter, Special Agent Perry asked Cooper if "she had anything around her waist area or strapped to her body" to which she "didn't respond," so

3

Special Agent Perry added that he "could see a bundle in [her] waist area." Doc. 36 at 22. Special Agent Perry then claims he observed Cooper shift the blanket that had been draped over her shoulder to cover more of her midsection. *Id.* at 22-23. Special Agent Perry informed the Defendant that he could see a bulge beneath her clothing and inquired if she had anything under her shirt; she responded, "my stomach." Doc. 17 at 6; (9:03). After a brief exchange in which Special Agent Perry urged that he could see something concealed in Cooper's clothing, the special agent queried if Cooper would "show SA Perry her bag underneath of the bus." Doc. 17 at 6; (9:03 – 9:39). Evidently, this was a primarily a ploy to separate Cooper from Connor because Special Agent Perry suspected that Connor may have been exerting influence over Cooper, including pressuring her to evade the special agent's questioning. Doc. 36 at 24-25. In the Defendant's version, consistent with her position that she did not feel free to decline Special Agent Perry's requests, he "ordered her to exit the bus." Doc. 14 at 3.

      The Defendant and Special Agent Perry exited the bus together and the Defendant indicated that a small, red suitcase belonged to her. *Id.* at 7; (10:13). Special Agent Perry again asked if she was traveling with anyone and she again replied that she was traveling alone and that she did not know Connor. (10:16). Special Agent Perry repeatedly insisted that he believed that there was something hidden beneath her clothing (10:22); after prodding from the agent, she retorted that it was "a shit bag" (10:24), evidently referring to a colostomy bag. Doc. 17 at 7; Doc. 36 at 25-26. The government claims that Special Agent Perry knew that it was not a colostomy bag "because of its irregular shape;" the agent then "decided to arrest Defendant, instructed her to put her hands behind her back, and handcuffed her." Doc. 17 at 7. *See also* (10:46).

4

At this point, the recording ends (11:07), but the Defense claims that Cooper was held "in the rear portion of a full sized sport utility vehicle which had a wire mess [sic] cage in the rear passenger compartment" for "more than an hour while Agent Perry attempted to conduct a further investigation of Ms. Cooper's traveling companion." Doc. 14 at 3. On cross-examination, Special Agent Perry noted that he did not "think it was more than an hour," but that he was "not exactly sure" how long Cooper was confined in the truck before she was taken to the DEA station. Doc. 36 at 72. Despite the absence of testimony on this matter, it is clear that after Special Agent Perry finished his investigation at the bus station he then "transported Ms. Cooper to the DEA Offices" a few miles away. Doc. 14 at 3. There, "DEA Special Agent Julie Olmstead photographed Ms. Cooper then ordered Ms. Cooper to remove her shirt so that Agent Olmstead could take additional photographs;" the female agent "then reached inside of Ms. Cooper's girdle and retrieved a clear plastic bag" which contained 400 grams of a substance alleged to be methamphetamine. *Id.* Later, Cooper apparently waived her *Miranda* rights and gave additional incriminating statements to the investigating agents. *Id.* at 4. Ultimately, however, the events after Special Agent Perry arrested Cooper are largely irrelevant, as the government has not disputed that *if* the arrest and subsequent search were unconstitutional, *then* any custodial statements made to government agents must also be suppressed. *See, e.g.*, Doc. 22 at 1 n.1. *Cf. Water Pik, Inc. v. Med-Systems, Inc.*, 726 F.3d 1136, 1160 (10th Cir. 2013).

The Defendant was subsequently charged in a one count Indictment filed with the Court on June 11, 2014. *See generally* Doc. 9. Defendant now moves the Court to suppress any evidence and statements obtained as a result of this purportedly illegal search and seizure. The government respectfully opposes Cooper's request and asks that the Court deny the Motion.

**DISCUSSION**

**I.    The Fourth Amendment and Probable Cause**

Although Cooper states in her brief that she was "detained without any reasonable suspicion" and suggests that her interaction with Special Agent Perry was coercive, she appears to abandon these arguments in the body of her memorandum and focus on the claim that she was arrested without probable cause. Doc. 14 at 5. The remainder of the briefing and the hearing held on the Motion clarify that the only issue before the Court is whether Special Agent Perry had probable cause to arrest Cooper. *See generally* Docs. 17, 22, 36. If he did, then the parties concede that the subsequent search of her person and custodial statements she gave are admissible; conversely if he did not, there is no dispute that both the search and confession must be excluded. *See generally* Docs. 14, 17, 22. Consequently, the Court will not evaluate whether Special Agent Perry had reasonable suspicion to detain Cooper and "order" her off of the bus, not only because Defendant does not make any serious contention in this vein, but also because there is virtually no support for the argument that her apparent cooperation was coerced.

      a.   *The Probable Cause Standard*

The probable cause standard, although vexingly imprecise, is well-settled: "[a] police officer has probable cause to conduct a search [or arrest] when the facts available to [her] would warrant a [person] of reasonable caution in the belief that contraband or evidence of a crime is present." *Florida v. Harris*, 133 S. Ct. 1050, 1055 (2013) (internal quotation marks omitted); *United States v. Pulliam*, 748 F.3d 967, 971 (10th Cir. 2014) ("Probable cause refers to a probability or substantial chance of criminal activity, based on the commonsense [and] practical considerations of everyday life.") (internal quotation marks and citation omitted) (modification

6

original).  As with reasonable suspicion, "probable cause is not reducible to precise definition or quantification" and the Supreme Court has "rejected rigid rules, bright-line tests, and mechanistic inquiries in favor of a more flexible, all-things-considered approach." *Harris*, 133 S. Ct. at 1055. (internal quotation marks omitted).  *Cf. Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006) ("the ultimate touchstone of the Fourth Amendment is reasonableness.") (internal quotation marks omitted).  Importantly, the Court "may not engage in a divide-and-conquer analysis of facts to determine whether probable cause existed" but rather should view all of the factors together.  *United States v. Muñoz-Nava*, 524 F.3d 1137, 1144 (10th Cir. 2008) (internal quotation marks omitted).  Thus, even factors that are also consistent with innocent behavior or have "an innocent connotation" may be considered for whatever value they add to the Court's evaluation. *Id.* at 1144-45.  "However, neither may a court arrive at probable cause simply by piling hunch upon hunch," nor should it ignore those factors that "militate against" a finding of probable cause.  *United States v. Valenzuela*, 365 F.3d 892, 897 (10th Cir. 2004).

b.  *The Government's Eight Factors*

In its brief, the government sets forth eight factors that it believes justified Special Agent Perry in concluding that he had probable cause to arrest Cooper.  The Court will address the significance of each of these elements and then evaluate the aggregate effect of the information available to Special Agent Perry at the time of the arrest.  *See Muñoz-Nava*, 524 F.3d at 1144 ("We may not look at the factors in isolation, but instead must consider the totality of the circumstances to determine whether rational inferences can be drawn from the facts to support probable cause.").  Items five, six, and eight are inextricably intertwined; consequently they will be discussed together.

7

The government's first factor, "traveling from west to east on a Greyhound bus" is essentially irrelevant. Not only is that fact equally true of everyone else on the bus, but also, "[t]ravel from a 'drug source city' is 'so broad as to be indicative of almost nothing.'" *Id.* at 1145 (quoting *United States v. Guerrero*, 472 F.3d 784, 787–88 (10th Cir. 2007)). *Cf. United States v. Santos*, 403 F.3d 1120, 1132 (10th Cir. 2007) ("If travel between two of this country's largest population centers is a ground on which reasonable suspicion may be predicated, it is difficult to imagine an activity incapable of justifying police suspicion and an accompanying investigative detention. Our holding that suspicious travel plans can form an element of reasonable suspicion should not be taken as an invitation to find travel suspicious per se."). Further, as defense counsel illustrated at the hearing, Special Agent Perry did not appear to find individuals traveling from Tijuana, Mexico to Oklahoma comparably suspicious. Doc. 36 at 43-45. In the Court's estimation, this factor is merely used to bolster the hunches of government agents with an ostensibly objective indicium of criminal activity; upon any significant reflection, it is obvious that this element cannot contribute much to justifying a warrantless search or seizure. Even so, the Court will note that the bus was bound from southern California for points east and bear this in mind in evaluating probable cause.

The second factor, "traveling under a false name" carries little more weight. While there is a line of cases in this circuit that explains that adopting an alias for the purposes of travel may contribute to an officer's suspicion, in light of the discussion at the hearing, the Court does not believe that this factor is particularly salient in the instant case. *Compare United States v. Valles*, 292 F.3d 678, 680 (10th Cir. 2002) ("Precedent makes clear that traveling under an alias contributes to reasonable suspicion.") *and United States v. Hall*, 978 F.2d 616, 621 (10th Cir.

1992) (noting that "traveling under an alias" is "objectively suspicious") *with* Doc. 36 at 58-59. Stated simply, because bus tickets, unlike airline or Amtrak tickets, do not require that the travel document bear the precise legal name of the passenger, the Court finds the suggestion that Cooper travelled under an alias ill-fitting. To the contrary, defense counsel illustrated on cross-examination that it is not uncommon for bus tickets to be issued in the name of the person who purchased the ticket, rather than in the traveller's name. Doc. 36 at 58-59.

Moreover, Cooper provided Special Agent Perry with accurate identification upon request and, if the agent found the situation suspicious, it remains entirely unclear why he did not simply ask Cooper for clarification. *Cf. Romero v. Fay*, 45 F.3d 1472, 1476-77 (10th Cir. 1995) ("the cases state that the probable cause standard of the Fourth Amendment requires officers to reasonably interview witnesses readily available at the scene, investigate basic evidence, or otherwise inquire if a crime has been committed at all before invoking the power of warrantless arrest and detention."); *Koch v. City of Del City*, 660 F.3d 1228, 1240 (10th Cir. 2011) ("It is true that police officers may not ignore easily accessible evidence and thereby delegate their duty to investigate and make an independent probable cause determination based on that investigation.") (internal quotation marks omitted).

The fact that Special Agent Perry's "practice is, if I find someone that I believe is not being honest with me, not to what I refer to as call them on their dishonesty" and that it is "not something that [he] generally ask[s]" does not alter the Court's conclusion that he was obliged to do so; government agents may not refuse to engage in even the most basic investigation and expect the Court to adopt their conclusions. Doc. 36 at 104-105. Holding otherwise would mean that officers could secure probable cause by studiously avoiding any testing of their suspicions,

9

and, instead, merely accumulating specious innuendo; certainly the Fourth Amendment does not sanction such conduct. The Court recognizes that traveling with a ticket bearing a name other than your own may add some degree of suspicion to an officer's analysis, but, given the circumstances of bus travel in this country and the fact that Special Agent Perry took no steps to substantiate his concern, the Court will accord this factor substantially less weight.

However, the fact that "Defendant [apparently] lied to SA Perry regarding whether she was traveling alone or with another person" accords the third factor greater importance. Doc. 17 at 11. Given the identical surnames on their tickets, their shared itinerary, and the fact that each appeared to have a ticket bearing the name of a person of the opposite sex, Special Agent Perry was warranted in believing that Cooper and Connor had both lied to him about travelling together. *See, e.g.,* Doc. 36 at 18-20. It is unclear to the Court what motivation, if any, Cooper and Connor might have had for attempting so clumsily to conceal their connection to one another, but irrespective of the content of the lie, verifiable evasion of this variety may certainly contribute to probable cause. *Cf. United States v. Duegaw*, 327 F. Supp. 2d 1248, 1250 (D. Kan. 2004) (noting that "answers regarding his relationship and travel plans with his companion seemed suspicious and evasive" and considering this factor in establishing probable cause).

The fourth factual element does not add much to the Court's analysis. Even imputing facts pertaining to Connor to the probable cause determination supporting Cooper's arrest, it is unclear what, precisely, Special Agent Perry found suspicious about Connor's conduct. The special agent's testimony on this issue indicates that Connor "was walking back and forth in the seats as I was speaking with other passengers. And as if he was looking for something. And then he walked back and forth repeatedly from the front of the bus to the area, and then he sat

down in the seat one seat to the rear and across the aisleway from Miss Cooper." Doc. 36 at 17. Special Agent Perry elaborated slightly on cross-examination, noting that Connor "was not a normal passenger" in part because "most passengers, when they get in to Albuquerque, they get off the bus, they go back to the same seat, and they actually fight over those seats sometimes." *Id.* at 54.  While the Court will consider this fact for whatever it adds to the aggregate analysis, this is a thin reed on which to rest any considerable weight; the fact that a passenger walked up and down the aisle, either looking for a new seat, looking for a lost personal item, or waiting for a travel companion does not indicate to the Court that it is any more likely that either Cooper or Connor had engaged in any illicit activity.

Fifth, Special Agent Perry testified that during his conversation with Cooper she moved a blanket to "conceal[] her lower waist area" after he indicated that he had seen something beneath her shirt. *Id.* at 22.  In context, the Court finds that this move to obscure her midsection with a blanket qualifies as a "furtive movement" that might contribute to a finding of probable cause. *See, e.g.*, *United States v. McGehee*, 672 F.3d 860, 870 (10th Cir. 2012) (noting that the defendant's "furtive efforts to conceal the firearm could meaningfully contribute to an officer's reasonable conclusion that there was probable cause"); *United States v. DeJear*, 552 F.3d 1196, 1201 (10th Cir. 2009) (noting that furtive movements may contribute to reasonable suspicion). Even if this represents mere coincidence or a reflexive reaction to a federal official commenting on the appearance of her belly, the timing of the movement shortly after Special Agent Perry inquired whether she anything beneath her shirt contributes to the information included in his probable cause calculation when he decided to arrest Cooper.

Finally, the government seeks to split factors five, six, and eight into separate items, but, at bottom, they all amount to the same contention: that Special Agent Perry observed a bulge beneath Cooper's clothing and that she gave two different explanations for what it was. The Court is deeply skeptical of this factor. Although the Court must accord some deference to Special Agent Perry's extensive experience as a drug interdiction officer, *Ornelas v. United States*, 517 U.S. 690, 700 (1996) ("police officer may draw inferences based on his own experience in deciding whether probable cause exists"), bulges are susceptible to multiple innocent interpretations, which diminishes their value in establishing probable cause. *See United States v. Tovar–Valdivia*, 193 F.3d 1025, 1028 (8th Cir.1999) ("The bulges could have been bandages about his body, a money belt worn about his ribs, or any number of non-contraband items"); *United States v. Aquino*, 674 F.3d 918, 927 (8th Cir. 2012) ("our prior cases clearly establish an officer's observation of a concealed bulge, without more, does not suffice for probable cause.").

This is emphatically so in the instant case; based on the photos introduced into evidence at the hearing, the Court does not believe that Special Agent Perry could have seen a conspicuous bulge beneath Cooper's shirt. The photos reveal that when Special Agent Perry approached Cooper, she was wearing a baggy grey t-shirt and sweatpants; even viewed from the side, the Court struggles to find a perceptible non-human shape beneath the fabric. Indeed, the photo, taken in profile, of the drug bundle beneath her spandex undergarment shows that the package largely conforms to the contours of her abdomen; the Court strains to imagine how anyone, when Cooper was seated, could have differentiated between a non-human shape and the ordinary rumples of baggy clothing and human flesh. Of course, the Court cannot know

12

precisely how Cooper appeared to Special Agent Perry on the bus that day, particularly when seated, but the Court does not believe that any form the special agent was able to see beneath Cooper's shirt was suspicious.

Further, while the government alleges that Special Agent Perry *knew* that Cooper's responses regarding the nature of the bulge were lies, on the facts available to him at the time, the Court does not share his certainty; Cooper had replied both that only her "stomach" was beneath her shirt and that she had a colostomy bag. While this might appear evasive, it is also consistent with ordinary modesty or embarrassment exhibited by any person faced with divulging intimate medical details to a stranger. *Cf. United States v. Jones*, 254 F.3d 692, 697 (8th Cir. 2001) ("Unlike the traveler in *Favela,* who was unable to explain the bulge on her midsection, Jones told Lutter that the bulge on his midsection was from a recent surgery."). Hence, while this cluster of facts carries some weight in establishing probable cause, the Court is wary of according Special Agent Perry's determination too much significance.

The result of this analysis is to leave the Court with an extremely close case. Viewed in aggregate, Special Agent Perry confronted a couple who had demonstrably lied about traveling eastbound together, carrying tickets issued in names other than their own, one of whom appeared to have a slightly paunchy stomach, for which she gave a plausible explanation. Given the fact that Special Agent Perry made no effort to investigate the purportedly suspicious tickets and the indeterminate appearance of Cooper's stomach, the Court cannot find that Special Agent Perry had probable cause to arrest Cooper. The Court grants that Special Agent Perry was warranted in being suspicious of Cooper and Connor, but he took no additional steps to develop a factual investigation that might have substantiated a finding of probable cause.

## II.     Custodial Statements

A statement made after an illegal seizure is presumptively inadmissible; the burden is on the government to establish that the statement was both voluntary and sufficiently separated from the Fourth Amendment violation. *See United States v. Melendez-Garcia*, 28 F.3d 1046, 1053 (10th Cir. 1994) ("When a consensual search is preceded by a Fourth Amendment violation, as in this case, the government must prove not only the voluntariness of the consent under the totality of the circumstances, but the government must also establish a break in the causal connection between the illegality and the evidence thereby obtained.") (internal quotation marks and citations omitted). *See also Brown v. Illinois*, 422 U.S. 590, 604 (1975) ("the burden of showing admissibility rests, of course, on the prosecution."). "Although the two requirements will often overlap to a considerable degree, they address separate constitutional values and they are not always coterminous." *Melendez-Garcia*, 28 F.3d at 1054.

For these purposes, "voluntariness" is determined according to the rule laid out in *Schneckloth v. Bustamonte*. Consequently, "[t]he question whether the respondent's consent … was in fact voluntary or was the product of duress or coercion, express or implied, is to be determined by the totality of all the circumstances." *United States v. Mendenhall*, 446 U.S. 544, 557 (1980) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973)). *See also United States v. Sawyer*, 441 F.3d 890, 894 (10th Cir. 2006) (the "validity of consent to search requires a factual determination based upon the totality of the circumstances of whether the consent was 'the product of an essentially free and unconstrained choice by [the] maker,' or whether it was 'the product of duress or coercion, express or implied'") (quoting *Schneckloth*, 227 U.S. at 225-27) (internal citations omitted). This is a highly fact-dependent inquiry that asks the Court to

evaluate whether, "under the totality of the circumstances" the defendant genuinely acted voluntarily. *United States v. Thompson*, 524 F.3d 1126, 1133 (10th Cir. 2008). *See also Sawyer*, 441 F.3d at 894 ("Under federal law, consent is valid if it is freely and voluntarily given.") (internal quotation marks omitted). It is clear in the Tenth Circuit that the burden rests with the government to prove voluntariness; the "Government establishes voluntariness only if it (1) produces clear and positive testimony that the consent was unequivocal, specific, and freely given, and (2) proves that consent was given without duress or coercion, express or implied." *United States v. Sims*, 427 F.3d 945, 952 (10th Cir. 2005).

Even if the confession was voluntarily given, however, it must be sufficiently separated from the constitutional violation. "To demonstrate that the taint of an illegal seizure has dissipated, 'the government must prove, from the totality of the circumstances, a sufficient attenuation or break in the causal connection between the illegal detention and the consent.'" *United States v. Fox*, 600 F.3d 1253, 1259 (10th Cir. 2010) (quoting *United States v. Gregory*, 79 F.3d 973 979 (10th Cir. 1996)). "This is a heavy burden." *Fox*, 600 F.3d at 1259. To aid in this analysis, the Supreme Court has articulated three non-exhaustive factors for courts to consider: "1) the temporal proximity between the police illegality and the consent to search; 2) the presence of intervening circumstances; and particularly 3) the purpose and flagrancy of the official misconduct." *Melendez-Garcia*, 28 F.3d at 1054 (internal quotation marks omitted).

In the instant case, while the government does not dispute that the search and the statements must survive or fail together, the Court will still conduct its own analysis. Cooper appears to concede that her statements were "voluntary" for the purposes of *Schneckloth* and instead argues that her statements must be suppressed because they "were obtained by exploiting

15

the illegality of the arrest." Doc. 14 at 9 (quoting *Brown*, 422 U.S. 600).  From the timeline adduced at the hearing, it does not appear that there was any substantial passage of time between this conduct and Cooper's confession; in fact, Special Agent Perry believed that less than an hour elapsed between the moment he arrested Cooper and their departure for the DEA office.  *See* Doc. 36 at 72.  *See also, e.g.*, *United States v. Maez*, 872 F.2d 1444, 1455-56 (10th Cir. 1989) (thirty minutes held insufficient to remedy illegal arrest); *United States v. Mendoza–Salgado*, 964 F.2d 993, 1012 (10th Cir.1992) (thirty to forty-five minute period by itself "reveal[ed] little about whether the [time] that elapsed had any effect on [the] decision to permit the search").  Hence, this factor weighs against a finding of attenuation.

     Second, there was no intervening event of substance to "isolate the defendant from the coercive effects of the original illegal stop."  *Gregory*, 79 F.3d at 980.  While Cooper apparently waived her *Miranda* rights, such waivers, without more, are insufficient to break the causal chain.  *Fox*, 600 F.3d at 1260 ("Some examples of intervening circumstances include *carefully explain[ing]* a consent form and advising an individual of the right to withhold consent," or "release from custody, an appearance before a magistrate, or consultation with an attorney.") (internal quotation marks and citations omitted).  *Cf. Kaupp v. Texas*, 538 U.S. 626, 633 (2003) ("we held in *Brown* that *Miranda* warnings, *alone* and *per se,* cannot always ... break, for Fourth Amendment purposes, the causal connection between the illegality and the confession.") (internal quotation marks omitted).  This factor, too, likely tilts in favor of suppression.

     Third and finally, it does not appear as though the conduct at issue qualifies as "flagrant" for the purposes of *Brown*.  Special Agent Perry did not act violently or threaten the Defendant; however, while Special Agent Perry may have believed that he had probable cause, the Court

views the encounter as part of an unwarranted fishing expedition predicated on insufficient investigation and an unsubstantiated hunch. *Cf. Fox*, 600 F.3d at 1261 ("purposeful and flagrant misconduct is generally found where: (1) the impropriety of the official's misconduct was obvious or the official knew, at the time, that his conduct was likely unconstitutional but engaged in it nevertheless; and (2) the misconduct was investigatory in design and purpose and executed in the hope that something might turn up.") (internal quotation marks omitted). Even if this factor is indeterminate, the strength of the other two factors is sufficient to demand that the statements be suppressed because the government cannot meet its "heavy burden" of showing that the constitutional violation had been attenuated. *Id.* at 1260.

## CONCLUSION

The Court repeats that it believes this to be a very close case. The facts plainly establish a reasonable suspicion to detain Cooper, but, given the clothing that Cooper wore that day, the photos of the bundle on her person that the Court has reviewed, and the fact that Special Agent Perry did not investigate any of his suspicions regarding her ticket or travel plans, the Court does not believe that he had probable cause to arrest Cooper. All evidence obtained as a result of the arrest, including any custodial statements Cooper gave, must be suppressed.

**IT IS THEREFORE ORDERED** that the Defendant's Motion to Suppress Evidence [Doc. 14] is **GRANTED.**

Dated this 3rd day of April, 2015.

_____
**MARTHA VÁZQUEZ**
UNITED STATES DISTRICT JUDGE